# UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| MANDARIN MATRIX LIMITED, a Hong Kong Company, and MANDARIN MATRIX, Inc., a Delaware Corporation,<br><br>Plaintiffs,<br><br>v.<br><br>UTAH STATE BOARD OF EDUCATION, a Utah State Agency, KARL BOWMAN, in his individual and official capacities, STACY LYON, in her individual and official capacities, YU JAYNE YOUNG, in her individual and official capacities, and JOHN and JANE DOES 1–10, in their individual and official capacities,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING [30] DEFENDANTS' MOTION TO DISMISS**<br><br>Case No. 2:25-cv-01067-DBB-CMR<br><br>District Judge David Barlow |

Before the court is Defendants Utah State Board of Education ("USBE"), Karl Bowman, Stacy Lyon, and Yu Jayne Young's (collectively, "Defendants") Motion to Dismiss.[1] Defendants seek dismissal of all claims asserted against them by Mandarin Matrix Limited and its United States affiliate Mandarin Matrix Inc. (collectively, "MMX") for lack of subject matter jurisdiction.[2] Alternatively, Defendants seek dismissal of MMX's direct and contributory copyright infringement causes of action for failure to state a claim.[3]

---

[1] Defs.' Mot. to Dismiss ("Mot."), ECF No. 30, filed Jan. 20, 2026.
[2] Mot. 1.
[3] *Id.*

## BACKGROUND[4]

Mr. Bowman, Ms. Lyon, and Ms. Young (collectively, "Individual Defendants") are employed with USBE in language immersion positions.[5] Specifically, Mr. Bowman is USBE's World Languages and Dual Language Immersion Specialist, Ms. Lyon is its Chinese Dual Language Immersion Director, and Ms. Young is its Chinese Dual Language Immersion Coordinator.[6] In 2008, the USBE created the Dual Language Immersion ("DLI") program, which includes a Mandarin Chinese program ("Chinese DLI program") available in numerous school districts statewide and approximately 73 local education agencies ("LEA").[7] USBE must disburse DLI program funds to LEAs by July 1 of each fiscal year, subject to state appropriation.[8]

Since 2014, USBE has used MMX as a third-party curriculum vendor for its Chinese DLI program.[9] Until 2024, USBE regularly communicated with MMX about the Chinese DLI program's enrollment estimates and requirements to ensure that MMX could provide suitable curricular materials, which include printed, online, and electronic educational materials and services related to Mandarin language instruction to Utah's elementary, secondary, and high school students.[10]

---

[4] The facts in this section are drawn from the Complaint. *See* Compl., ECF No. 1, filed Nov. 21, 2025. In reviewing a motion to dismiss, the court accepts all well-pleaded facts as true and views them in the light most favorable to the plaintiff. *See, e.g.*, *Beedle v. Wilson*, 422 F.3d 1059, 1063 (10th Cir. 2005).
[5] Compl. ¶¶ 4–6, ECF No. 1, filed Nov. 21, 2025.
[6] *Id.*
[7] *Id.* ¶¶ 22–23.
[8] Utah Admin. R. R277-488-3(1).
[9] Compl. ¶ 29.
[10] *Id.* ¶¶ 30–31.

MMX contracts directly with LEAs, not USBE, to sell its curricular materials, including printed materials and licenses to access MMX's online electronic platform—Mandarin Matrix Online Classroom ("MMOC Licenses").[11] Because MMX prints to order its printed materials and offers a bulk-purchasing discount on all its curricular materials, it has historically coordinated with USBE to project the approximate student enrollment for the upcoming school year.[12]

In May 2024, MMX provided Mr. Bowman and Ms. Lyon its estimated MMOC License pricing for the 2024–2029 school years.[13] MMX based its $50 price-per-license estimate on the student enrollment of "approximately 11,500" for the 2023–2024 school year and included a chart that showed the prices for enrollment at lower numbers, such as $54 price-per-license for 11,000 students all the way to $82 price-per-license for just 4,000 students.[14] When Mr. Bowman and Ms. Lyon failed to reply, MMX followed up with Mr. Bowman on July 8, one week after the USBE is required to disburse DLI program funds.[15] The following week, Mr. Bowman replied that the "funds had not been sent out yet to the school districts."[16] The next day, Ms. Lyon emailed MMX that funding had come through, but it did not include sixth grade.[17] Her email continued, "We will need to adjust the invoices accordingly."[18]

---

[11] *Id.* ¶¶ 32, 33, 35.
[12] *Id.* ¶¶ 36–37, 43.
[13] *Id.* ¶ 51.
[14] *Id.* ¶¶ 52–54.
[15] *Id.* ¶¶ 55–57.
[16] *Id.* ¶ 58.
[17] *Id.* ¶ 61.
[18] *Id.*

The elimination of sixth grade reduced the actual number of students enrolled and using MMOC Licenses by 1,246.[19] Based on Ms. Lyon's email, MMX believed that USBE would follow the pricing scheme MMX outlined in its chart for lower enrollment.[20] However, Mr. Bowman indicated that USBE would pay only the agreed-price of "$50 per license regardless of how many licenses [USBE] purchased."[21] Although the parties eventually resolved the dispute, MMX believed it created "personal animus" against MMX that led to Mr. Bowman and Ms. Lyon's alleged "tortious, collusive" behavior regarding MMX-related pricing for the 2025–2026 school year.[22]

MMX alleges that by April 2025, Mr. Bowman and Ms. Lyon had determined to use Fields, a competing third-party vendor, but provided no indication of that intention to MMX that they would not work with it in the 2025–2026 school year.[23] On May 29, 2025, Mr. Bowman notified MMX in an email that "we have decided that we will no longer be purchasing licenses from Mandarin Matrix moving forward."[24] Instead, they contracted with Fields.[25] MMX alleges that Mr. Bowman and Ms. Lyon conspired to terminate USBE's longstanding relationship with MMX as early as September, 2024.[26]

Three months after USBE terminated its relationship with MMX, MMX received an email from a Chinese DLI program teacher stating, "We were told we can still use our MMX

---

[19] *Id.* ¶ 63.
[20] *Id.* ¶ 71.
[21] *Id.* ¶ 85.
[22] *Id.* ¶¶ 96–97, 196.
[23] *Id.* ¶¶ 98–113, 120. Shortly before Mr. Bowman's email, Ms. Young listed the MMOC License pricing as $130 per license on the USBE Chinese DLI Purchasing Guide. *See id.* ¶ 121. This pricing did not reflect the $51 per license fee that had been communicated between MMX and Mr. Bowman and Ms. Lyon in emails from March and May of 2025. *See id.* ¶ 122.
[24] *Id.* ¶ 131.
[25] *Id.* ¶ 113.
[26] *Id.* ¶ 134.

account, however, I've been trying two days in a row and still can't open the account."[27] This led MMX to believe that Individual Defendants had directed Chinese DLI program teachers to continue using MMOC, despite knowing that doing so violated MMX's term and conditions.[28]

MMX's intellectual property ("IP") is protected through copyrights of its printed materials and MMOC platform ("MMX Copyrights") and through agreements with freelancers and consultants that contain confidentiality and copyright provisions prohibiting unauthorized reproduction of its digital and print work.[29] Many of the freelancers are USBE employees, including Ms. Lyon.[30] As early as 2023, and again in January 2025, Ms. Lyon requested MMX to invest in designing its curricular materials through agreements with Utah-based teachers, including Fields' CEO and founder, Eric Chipman.[31]

In November 2025, MMX filed this action against USBE and Individual Defendants.[32]

## STANDARD

Under Federal Rule of Civil Procedure 12(b)(1), a court may dismiss an action for lack of subject matter jurisdiction.[33] "Subject matter jurisdiction defines the court's authority to hear a given type of case" and "represents the extent to which a court can rule on the conduct of persons or status of things."[34] Because "[f]ederal courts are courts of limited jurisdiction," it is

---

[27] *Id.* ¶ 240.
[28] *Id.* ¶ 241.
[29] *Id.* ¶¶ 226–228, 230, 237.
[30] *Id.* ¶ 229.
[31] *Id.* ¶¶ 110, 250, 254.
[32] *See generally* Compl.
[33] Fed. R. Civ. P. 12(b)(1).
[34] *City of Albuquerque v. Soto Enters., Inc.*, 864 F.3d 1089, 1092–93 (10th Cir. 2017) (internal quotation marks and citations omitted).

"presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction."[35]

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss an action that fails "to state a claim upon which relief can be granted."[36] "Dismissal under Rule 12(b)(6) is appropriate only if the complaint, viewed in the light most favorable to the plaintiff, lacks enough facts to state a claim to relief that is plausible on its face."[37] "In evaluating a motion to dismiss, the court must take as true all well-pleaded facts, as distinguished from conclusory allegations, view all reasonable inferences in favor of the nonmoving party, and liberally construe the pleadings."[38] However, a "complaint cannot rely on labels or conclusory allegations—a 'formulaic recitation of the elements of a cause of action will not do.'"[39] Instead, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[40]

## DISCUSSION

MMX asserts four claims that Defendants seek to dismiss: (1) direct copyright infringement against USBE, Mr. Bowman, and Ms. Lyon; (2) contributory copyright infringement against USBE, Mr. Bowman, and Ms. Lyon; (3) tortious interference with

---

[35] *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted).

[36] Fed. R. Civ. P. 12(b)(6).

[37] *Abdi v. Wray*, 942 F.3d 1019, 1025 (10th Cir. 2019) (quoting *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 764 (10th Cir. 2019)).

[38] *McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1131 (10th Cir. 2024) (quoting *Reznik v. inContact, Inc.*, 18 F.4th 1257, 1260 (10th Cir. 2021)) (also quoting *Ruiz v. McDonald*, 299 F.3d 1173, 1181 (10th Cir. 2002)) (cleaned up).

[39] *Greer v. Moon*, 83 F.4th 1283, 1292 (10th Cir. 2023), *cert. denied*, 144 S. Ct. 2521 (2024) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).

[40] *Ashcroft* v. *Iqbal,* 556 U.S. 662, 678 (2009).

prospective economic relations against Defendants; and (4) civil conspiracy against Defendants.[41]

## I.    Rule 12(b)(1)

Defendants first argue that all MXM's claims should be dismissed for lack of subject matter jurisdiction on the basis of Eleventh Amendment sovereign immunity.[42] Next, Defendants argue that the *Ex parte Young* exception to Eleventh Amendment immunity does not apply.[43] And under Rule 12(b)(1), Defendants also seek dismissal of the third and fourth claims pursuant to the Utah Governmental Immunity Act ("UGIA").[44] The court addresses each argument in turn.

### A.    Eleventh Amendment Immunity

"The Eleventh Amendment states that '[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.'"[45] Immunity under the Eleventh Amendment "extends beyond states themselves to encompass 'governmental entities that are 'arms of the state.'"[46] However, the Eleventh Amendment "does not extend immunity to *all* entities associated with a state."[47] For example, immunity extends to states and state entities, but not to local government entities such as counties or municipalities.[48] Thus, "[i]f a state entity is more like a political subdivision—such as a county or city—than it is

---

[41] Compl. 54–64.
[42] Mot. 2–8.
[43] Mot. 8–10.
[44] Mot. 10–13.
[45] *Good v. Dep't of Educ.*, 121 F.4th 772, 788 (10th Cir. 2024) (quoting U.S. Const. amend. XI).
[46] *Id.* at 789 (quoting *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 574 (10th Cir. 1996) (citation omitted).
[47] *Id.* (emphasis supplied).
[48] *See Hennessey v. Univ. of Kansas Hosp. Auth.*, 53 F.4th 516, 527 (10th Cir. 2022).

like an instrumentality of the state, that entity is not entitled to Eleventh Amendment immunity."

"The key inquiry, then, is whether an entity seeking the protection of the Eleventh Amendment qualifies as an arm of the state. If it does, it is entitled to Eleventh Amendment immunity. If not, Eleventh Amendment immunity is inapplicable."[49]

In *Good v. Department of Education*, the Tenth Circuit recently reviewed its "robust doctrine for determining whether an entity created by a state is, in fact, an arm of the state entitled to Eleventh Amendment immunity."[50] In doing so, the court reaffirmed its two-step test promulgated in *Hennessey v. University of Kansas Hospital Authority* that determines first, whether an entity is an arm of the state, and second, whether a judgment would come from state funds or be an affront to state dignity.[51]

**First Step: The *Steadfast* Factors**

Under the first step, a court evaluates four factors articulated in *Steadfast Insurance Company v. Agricultural Insurance Company*:

> *First*, we assess the character ascribed to the entity under state law. Simply stated, we conduct a formalistic survey of state law to ascertain whether the entity is identified as an agency of the state. *Second*, we consider the autonomy accorded the entity under state law. This determination hinges upon the degree of control the state exercises over the entity. *Third*, we study the entity's finances. Here, we look to the amount of state funding the entity receives and consider whether the entity has the ability to issue bonds or levy taxes on its own behalf. *Fourth*, we ask whether the entity in question is concerned primarily with local or state affairs. In answering this question, we examine the agency's function, composition, and purpose.[52]

---

[49] *Good*, 121 F.4th at 789.
[50] *Id.* at 790.
[51] *Id.* at 790–93.
[52] *Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007).

In the Tenth Circuit, the party asserting that it is an arm of the state bears the burden.[53]

Therefore, the court turns to Defendants' arguments under each *Steadfast* factor.

### 1.    Character of USBE Under State Law

"The focus of this factor is on how state statutes and other sources of state law characterize the entity."[54] The inquiry, then, should include a "survey of state law to ascertain whether the entity is identified as an agency of the state."[55] Defendants cite constitutional, statutory, and case law to argue that "Utah law characterizes USBE as a governmental entity entitled to state sovereign immunity under UGIA."[56]

The UGIA defines the "State" as including "each office, department, division, agency, authority, commission, board, institution, hospital, college, university, Children's Justice Center, or other instrumentality of the state."[57] USBE is, as its name suggests, a "board." Several courts have also expressly or implicitly acknowledged that USBE is an arm of the state. For example, in *Drown v. Utah State Office of Education*, the Tenth Circuit recognized USBE as an arm of the state where plaintiff "[did] not contest that the State Defendants qualify as arms of the state."[58] In *V.W. v. DaVinci Academy of Science and the Arts*, the court held that "the State School Boards are 'arms of the state' entitled to Eleventh Amendment Immunity."[59] Similarly, in *L.C. v. Utah State Board of Education*, the court determined that "the Utah State Office of Education and the

---

[53] *Hennessey*, 53 F.4th at 531.
[54] *Good*, 121 F.4th at 799.
[55] *Hennessey*, 53 F.4th at 528.
[56] Mot. 5.
[57] Utah Code 63G-7-102(9). *See also* Utah Const. art. X, § 1 ("The Legislature shall provide for the establishment and maintenance of the state's education systems . . . .").
[58] *Drown v. Utah State Office of Edu.*, 767 F. App'x 679, 684–85 (10th Cir. 2019).
[59] *V.W. v. DaVinci Acad. of Sci. & the Arts*, No. 1:09-cv-127, 2010 WL 3258326, at *2 (D. Utah Aug. 17, 2010).

Utah State Board of Education are therefore immune from Plaintiffs' claims."[60] And in *Sutton v. Utah State School for the Deaf and Blind*, the Tenth Circuit held that the Utah State School for the Deaf and Blind is an arm of the State, in part, because its board members are on the State Board of Education.[61]

MMX argues that the cases are distinguishable because the plaintiffs did not analyze arm-of-the-state immunity.[62] Be that as it may, the plaintiffs also did not challenge USBE's status as an arm of the state, and the cases align with how this court analyzes other state agencies.[63] Taken together, the statutory and common law cited by Defendants suggests that USBE is characterized as an arm of the state under Utah law.

### 2. Autonomy

Under the second factor, the court considers the "autonomy accorded the entity under state law."[64] This factor "is the most complex of the four because it spans a broad range of considerations."[65] The Tenth Circuit's non-exhaustive list of considerations includes

> (i) the control of the entity by the governor and the legislature; (ii) whether the entity's employees are classified as state employees; (iii) whether the entity has ownership or control of property; (iv) whether the entity has the ability to form its own contracts with government entities and commercial enterprises; (v) whether the entity has the ability to set its own policies without state oversight; and (vi) whether the entity has the ability to bring suit on its own behalf.[66]

---

[60] *L.C. v. Utah State Bd. of Edu.*, 188 F. Supp. 2d 1330, 1340 (D. Utah 2002), *aff'd*, 125 F. App'x 252 (10th Cir. 2005)

[61] *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1233 (10th Cir. 1999).

[62] Pl.'s Opp'n to Mot. to Dismiss ("Opp'n") 4, ECF No. 36, filed Mar. 17, 2026.

[63] *See, e.g.*, *Pomeroy v. Utah State Bar*, 598 F. Supp. 3d 1250, 1257 (D. Utah 2022) (concluding that the Utah State Bar is an arm of the state); *Rose v. Utah State*, No. 2:09-cv-695, 2009 WL 5066687, at *4 (D. Utah Dec. 16, 2009).

[64] *Good*, 121 F.4th at 792 (quoting *Hennessey*, 53 F.4th at 528).

[65] *Hennessey*, 53 F.4th at 536 (citing *Takle v. Univ. of Wis. Hosp. & Clinics Auth.*, 402 F.3d 768, 771 (7th Cir. 2005)).

[66] *Good*, 121 F.4th at 802 (quoting *Hennessey*, 53F.4th at 536–42).

However, the Tenth Circuit warns courts to "take care not to become caught up in the minutiae" of "this blizzard of sub-factors."[67] Instead, the "key inquiry" is whether the entity "retains substantial autonomy or if it operates with guidance or interference from the state."[68] This focus should consider "the entire relationship between the entity and the state."[69]

The first consideration looks at how much control the governor and legislature have over the entity at issue. The governor's authority to appoint board members "weighs in favor of arm-of-the-state status," but it is "not decisive as to autonomy because 'the power to appoint is not the power to control.'"[70] "Consequently, also relevant are '(1) the ability of the governor to remove appointees; and (2) the governor's power to block or veto action taken by the board of the entity.'"[71] It is also relevant whether the entity itself or the governor selects its leadership.[72]

Here, Defendants argue that this subfactor weighs in their favor because USBE receives its powers through "State Constitutional mandate," its board members are elected in state elections, and the board is subject to constitutional and statutory restrictions.[73] However, this subfactor actually somewhat favors USBE's autonomy because neither the governor nor the legislature has the authority to select or remove USBE's leadership. Instead, Utah Code section 53E-3-201(1) & (2) requires members of the state board to be nominated and elected and the state board to elect its own chair and vice chairs.[74] Utah Code section 53E-3-201(6) requires two-thirds of the state board to approve removal of an officer, and Utah Code section 53E-3-

---

[67] *Id.* (cleaned up).
[68] *Id.* (cleaned up).
[69] *Id.* (cleaned up).
[70] *Good*, 121 F.4th at 803 (quoting *Hennessey*, 53 F.4th at 537).
[71] *Id.* (quoting *Hennessey*, 53 F.4th at 537).
[72] *See id.*
[73] Defs.' Reply to Mot. to Dismiss ("Reply") 9, ECF No. 43, filed Apr. 24, 2026.
[74] Utah Code § 53E-3-201(1), (2).

302(2)(a) grants the state board authority to hire employees it deems necessary for the board to meet its objectives.[75] Thus, although the legislature itself enacted the statutes described above that limit its control, the fact remains that the governor and legislature cannot unilaterally select or remove appointees. Therefore, this subfactor weighs in favor of USBE's autonomy.

Second, the court considers the classification of the entity's employees. Evidence "that its employees are subject to the State's merits system for hiring or the State's retirement plan" weighs in favor of arm-of-the-state status.[76] Here, USBE employees are state employees who must participate in state retirement and benefit programs and are subject to merit-based hiring.[77] Although USBE is authorized to set compensation, it still must do so with money that has been appropriated for that purpose by the legislature.[78] Consequently, USBE's employees are considered state employees for purposes of this analysis, and the subfactor clearly weighs against USBE's autonomy.

Third, the court considers whether the entity owns and controls property. Under this factor, an "unfettered discretion to own property weighs in favor of [an entity's] autonomy."[79] An entity's ability "to hold property in its own name" is one of the "factors courts should consider when analyzing the 'independence' component."[80] Here, the USBE "does not currently own land or other real property."[81] Granted, USBE may own land or other real property, but Utah law proscribes when USBE can sell "any interest it holds in real property" and how it can

---

[75] *Id.* § 53E-3-302(2)(a).
[76] *Good*, 121 F.4th at 804.
[77] *See* Decl. of Scott Jones ("Jones Decl.") ¶ 7, ECF No. 43-1, filed Apr. 24, 2026.
[78] Jones Decl. ¶¶ 8–9; Utah Code § 53E-3-302(3).
[79] *Good*, 121 F.4th at 805.
[80] *Bd. of Cnty. Comm'rs of Sweetwater Cnty. v. Geringer*, 297 F.3d 1108, 1113 (10th Cir. 2002).
[81] Jones Decl. ¶¶ 2, 13.

use the proceeds from that sale.[82] Consequently, this subfactor weighs somewhat against USBE's autonomy.

The next consideration is whether an entity has an ability to form contracts. Defendants acknowledge that USBE has authority to enter into contracts, but it argues that it does so under guidance and restrictions established by the legislature.[83] However, the Tenth Circuit has held that despite an entity's need to obtain State approval for contracts, an entity's ability to form its own contracts weighs against arm-of-the-state status.[84] Thus, this subfactor favors USBE's autonomy.

Fifth, the court considers whether an entity sets its own policies. "An entity's ability to set its own policies, without oversight and control from the state or a state agency, is instrumental in the entity being autonomous from the state."[85] "Conversely, if day-to-day operations of an entity were controlled by the state, autonomy would almost certainly not exist."[86] Thus, the overarching question under this subfactor is whether the state imposes significant or minor limitations on an entity's ability to manage its day-to-day affairs.

Defendants argue that USBE's authority to establish policy and rules are constrained by constitutional provisions and statutes.[87] However, those provisions and statutes expressly provide USBE with "general control and supervision of the state's public education system"[88] in numerous ways, including the authority to "develop policies and procedures related to federal

---

[82] Utah Code § 53E-3-401(5)(a), (b).
[83] Reply 11.
[84] *See Good*, 121 F.4th at 806–07.
[85] *Good*, 121 F.4th at 807.
[86] *Hennessey*, 53 F.4th at 541.
[87] Reply 11–12.
[88] Utah Code § 53E-3-401(2)(a).

educational programs";[89] "provide procedures for addressing and resolving compliance and monitoring issues related to [the] public education code, federal law, or rules";[90] "make rules . . . regarding the qualifications, terms of employment, and duties of the superintendent of the Utah Schools for the Deaf and Blind";[91] and "make rules regarding using and expunging student data."[92] Although USBE must follow statutory limits on its authority, this sampling of statutes shows that overall, USBE "retains control over its day-to-day affairs and can set its own policies."[93] Accordingly, this subfactor weighs in favor of USBE's autonomy.

Finally, the court considers "the ability of the entity to sue and be sued, with the existence of such ability supporting a finding that the entity is autonomous."[94] Although the USBE may bring suit on its behalf and also be sued, the fact that USBE is represented in suits by the attorney general cuts against a finding of autonomy.[95]

After reviewing these subfactors, the court concludes that they are generally evenly split in terms of how autonomous USBE is from the state. Therefore, this second *Steadfast* factor does not move the needle on the court's analysis.

### 3.  Finances

Turning to the third *Steadfast* factor, the court considers "the extent to which the state financially supports the entity."[96] "The inability of an entity to levy taxes, combined with its receipt of all or most of its funding from the state, will serve as a strong indicator that the entity

---

[89] *Id.* § 53E-3-401(6).
[90] *Id.* § 53E-3-401(9).
[91] *Id.* § 53E-8-204(2)(b).
[92] *Id.* § 53E-9-306(1).
[93] *Good*, 121 F.4th at 808.
[94] *Id.* (quoting *Hennessey*, 53 F.4th at 541).
[95] Reply 12.
[96] *Good*, 121 F.4th at 809.

is an arm of the state."[97] Courts "also consider the existence, or lack thereof, of regulations on how an entity may handle its finances and whether the entity's funds are classified as public funds."[98]

The Tenth Circuit "ha[s] repeatedly indicated that whether the state bears legal liability for a judgment against the entity is an important consideration in our arm-of-the-state analysis."[99] In *Good*, this factor weighed against arm-of-the-state status because the entity did not receive direct financial assistance from the State, could generate revenues through investment and sale of bonds without much State oversight, and held "substantial control over its own assets."[100] In contrast, the USBE is "funded exclusively by state and federal taxes, as allocated and appropriated by the Utah State Legislature from the state treasury."[101] "The key question is whether funds to satisfy a money judgment would come directly from the state, or indirectly through commingled state and local funds *or state indemnification provisions*."[102] "In answering this question, we focus on the legal incidence, not the practical effect, of the liability."[103]

Here, USBE is mostly funded by the state. It cannot levy taxes or issue bonds, and its funds come exclusively from state and federal taxes, which are allocated and appropriated by the legislature.[104] Granted, the USBE determines compensation for its state superintendent and

---

[97] *Id.*

[98] *Id.* (internal quotation marks and citations omitted).

[99] *Id.* at 815–16.

[100] *Id.* at 817.

[101] Jones Decl. ¶ 8.

[102] *Sturdevant v. Paulsen*, 218 F.3d 1160, 1165 (10th Cir. 2000) (emphasis supplied).

[103] *Id.* (declining to conclusively resolve the interplay between the Risk Management Fund and the state's legal liability).

[104] Jones Decl. ¶¶ 8, 10.

employees.[105] It also may accept "private grants, loans, gifts, endowments, devises, or bequests which are made for educational purposes," which "are not subject to appropriation by the Legislature."[106] And it has the statutory authority to "apply for, receive, administer, and distribute to eligible applicants funds made available through programs of the federal government."[107] A judgment against USBE would be paid by the state—either through legislative appropriations or through insurance under the Utah State Risk Management Fund— because USBE lacks independent funds to pay the $12,900,000 in damages that MMX seeks.[108] MMX argues that payment by the Risk Management Fund does not come from the state's treasury.[109] Yet that argument overlooks the fact that the fund receives money appropriated from the legislature.[110] Although "[c]ourts have consistently held that state indemnification and insurance agreements, standing alone, do not transform a locally or informally created entity into an arm of the state," such policies may weigh in favor of arm-of-the-state status when "combined with [USBE's] lack of independent funding."[111] Taken together, USBE's lack of independent funds and coverage by Utah's Risk Management Fund strongly support a finding under this factor that USBE is an arm of the state.

### 4. State or Local Concern

---

[105] Utah Code § 53E-3-302(1), (3).

[106] *Id.* § 53E-3-402(1)-(2).

[107] *Id.* § 53E-3-501(4).

[108] *Id.* ¶¶ 14–15.

[109] Opp'n 16.

[110] Utah Code § 63A-4-201(3). *See also Colby v. Herrick*, 849 F.3d 1273, 1277 (10th Cir. 2017) (holding that where an entity "is entitled to participate in the [state's] risk management fund, which obtains money from state appropriations," that "use of state money supports consideration of the [entity] as an arm of the state") (citation omitted).

[111] *Owen v. State of Utah Legis. Servs.*, 2:25-cv-00485, 2026 WL 881586, at *6 (D. Utah Mar. 31, 2026).

The final *Steadfast* factor considers "whether the entity in question is concerned primarily with local or state affairs."[112] Both parties agree that this factor favors USBE.[113] And it does so unequivocally: Utah law provides that USBE has "general control and supervision of the state's public education system," which is "directed to the whole system."[114] This factor weighs in favor of an arm-of-the-state finding.

### 5.    Summary of *Steadfast* Factors

For the reasons above, the court concludes that three of the four *Steadfast* factors favor USBE as an arm of the state, and none conclusively favor MMX. When "the *Steadfast* factors point in different directions," the court "must proceed to the second step of the analysis, examining the Eleventh Amendment's twin reasons for being."[115] Here, none of the factors clearly favor MMX. Nevertheless, the court proceeds to the second step for sake of completeness.

## Second Step: The Eleventh Amendment's Twin Goals

Where the *Steadfast* factors are not dispositive, the court's "prime guide" becomes the two underlying reasons for the Eleventh Amendment: "protecting a state's dignitary interests and protecting a state treasury."[116]

### 1.    Effect on the Treasury

"The 'foremost' of the twin reasons is 'avoiding state liability for any judgment against the entity.'"[117] Thus, "common sense and the rationale of the Eleventh Amendment do not

---

[112] *Hennessey*, 53 F.4th at 528 (quoting *Steadfast*, 507 F.3d at 1253).
[113] Opp'n 16; Reply 15.
[114] Utah Code § 53E-3-401(2)(a)-(b).
[115] *Good*, 121 F.4th at 818.
[116] *Id.* (quoting *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 47 (1994)).
[117] *Good*, 121 F.4th at 819 (quoting *Hennessey*, 53 F.4th at 528).

require that sovereign immunity attach when an agency is structured to be self-sustaining and has a long history of paying its own way."[118] That is not the case here.

As noted above, USBE is by and large financially dependent on the state. It does not currently own property, cannot levy taxes or issue bonds, and its funds come from state and federal tax dollars, which are appropriated by the legislature each year.[119] Furthermore, a judgment against USBE would be paid from state dollars and thereby pose a "risk to the State's treasury." [120] As a result, this "foremost reason for sovereign immunity points strongly" towards considering USBE to be an arm of the state.[121]

### 2.    Dignity of the State

The "relevant inquiry" of "whether allowing a suit against an entity to go forward would impact a state's dignitary interests" can be "a difficult one in practice."[122] Granted, it may be straightforward. For instance, where "a state forms an ordinary corporation, with anticipated and actual financial independence, to enter the private sector and compete as a commercial entity, even though the income may be devoted to support some public function or use, that entity is not an arm-of-the-state."[123] But other times there are "mixed signals" from the State about "whether the entity was actually structured to share state sovereignty," such as in *Good* where the Tenth Circuit determined it was "far from clear" whether the State intended the student loan entity to

---

[118] *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 721 (10th Cir. 2006) *abrogated on other grounds by Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262 (2019).
[119] Jones Decl. ¶¶ 8–13.
[120] *Good*, 121 F.4th at 819.
[121] *Id.*
[122] *Id.*
[123] *Sikkenga*, 472 F.3d at 721.

share in its Eleventh Amendment immunity and consequently weighed this factor in favor of the entity's autonomy.[124]

Here, USBE is very different from the financially independent student loan entity in *Good* that was formed "to enter the private sector and compete as a commercial entity."[125] Rather, USBE is a constitutionally created entity that oversees the state's public education system and operates with legislatively appropriated funding. . Accordingly, it stands squarely as an entity that the state intended to share in its Eleventh Amendment immunity, and suit against it would adversely affect the state's dignity.

In short, USBE is an arm of the state under the twin goals of the Eleventh Amendment.

### B.    *Ex parte Young* Exception

MMX resists this outcome by briefly arguing that the *Ex parte Young* exception to Eleventh Amendment immunity applies to the Individual Defendants.[126] Under that exception, "a plaintiff may sue individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks only prospective relief."[127] "To satisfy this exception, the named state official 'must have some connection with the enforcement' of the challenged statute, . . . a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty."[128]

"Relief that in essence serves to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under federal law is barred even when the

---

[124] *Good*, 121 F.4th at 820.
[125] *Id.* at 820.
[126] Opp'n 20.
[127] *Frank v. Lee*, 84 F.4th 1119, 1132 (10th Cir. 2023) (citing *Ex parte Young*, 209 U.S. 123, 159–60 (1908)).
[128] *Id.*

state official is the named defendant. This is true if the relief is expressly denominated as damages. It is also true if the relief is tantamount to an award of damages for a past violation of federal law, even though styled as something else."[129] Put differently, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."[130]

MMX's complaint alleges, in part, an ongoing violation of federal law in its claims for direct and contributory copyright infringement.[131] And the relief MMX seeks from the Individual Defendants in the form of an immediate end to all infringing activities and the destruction of all infringing works is properly characterized as prospective.[132] Yet MMX also seeks "general, special, and actual damages, including statutory damages for willful infringement pursuant to the Copyright Act and punitive damages."[133] That relief plainly addresses alleged past harms, which makes it retrospective and outside the ambit of the *Ex parte Young* exception.[134] Moreover, MMX's copyright infringement claims are also levied against USBE, which makes the *Ex parte Young* exception inapplicable here.[135] Consequently, the exception does not apply.

C.    **Utah Governmental Immunity**

---

[129] *Papasan v. Allain*, 478 U.S. 265, 278 (1986) (citations omitted). *See also Cotto v. Campbell*, 126 F.4th 761, 771 (1st Cir. 2025) (quoting *Edelman v. Jordan*, 415 U.S. 651, 664–65 (1974)) ("*Ex parte Young* permits federal courts to issue prospective relief that requires state officials 'to conform [their] future conduct' to federal law, not retrospective relief that only 'make[s] reparation for the past.'").

[130] *Drown*, 767 F. App'x at 685.

[131] Compl. 54–57.

[132] *Id.* 63–64.

[133] *Id.* 64.

[134] *See Buchheit v. Green*, 705 F.3d 1157, 1159 (10th Cir. 2012) (characterizing relief "to address alleged past harms" as "retrospective").

[135] *See Israel v. Univ. of Utah*, 2:15-cv-741, 2017 WL 1393488, at *2 (D. Utah Apr. 18, 2017 ("Because Israel is suing the University of Utah directly, the *Ex Parte Young* exception does not apply even if Israel alleges ongoing violations of federal laws or seeks prospective injunctive relief.") (citing *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (holding that *Ex parte Young* "has no application in suits against the States and their agencies")).

Defendants also invoke immunity under the UGIA, which provides immunity to a government entity if it can make the following three showings: First, it must establish that "the activity giving rise to the plaintiff's claim served a governmental function."[136] Second, it must establish that "governmental immunity is not waived for the particular activity."[137] And third, it must show that "if immunity is waived for a particular activity, the activity falls under an applicable exception to that waiver."[138] In other words, the UGIA "shields the State and its employees acting in their official capacities from suit unless the State expressly consents to being sued."[139] The court declines to address this argument, however, because it has determined that Defendants are immune under the Eleventh Amendment.

## II.      Rule 12(b)(6)

Alternatively, Defendants seek dismissal of the two copyright infringement causes of action under Rule 12(b)(6) for failure to state a claim.[140] Having determined that the court lacks subject matter jurisdiction, however, it cannot reach this argument.[141]

---

[136] *DaVinci Acad. of Sci. & the Arts*, 2010 WL 3258326, at *4 (quoting *Grappendorf v. Pleasant Grove City*, 2007 UT 84, ¶ 6, 173 P.3d 166 (Utah 2007)).

[137] *Id.*

[138] *Id.*

[139] *Graves v. Utah Cnty. Gov't*, 2024 UT App 80, ¶ 14, 551 P.3d 1029.

[140] Mot. 13–18.

[141] *See, e.g.*, *Owen*, 2026 WL 881586, at *4 ("This court lacks subject matter jurisdiction if the defendants are immune under the Eleventh Amendment.").

## ORDER

Accordingly, Defendants' motion to dismiss is GRANTED. [142] Plaintiff's claims are dismissed without prejudice.

Signed June 18, 2026.

BY THE COURT

_____
David Barlow
United States District Judge

---

[142] ECF No. 30.